GRACE CATHEDRAL, INC., APPELLANT, *v.* TESTA, TAX COMMR., APPELLEE.

[Cite as *Grace Cathedral, Inc. v. Testa,* 143
Ohio St.3d 212, 2015-Ohio-2067.]

(No. 2014–0373—Submitted February 24, 2015—Decided June 2, 2015.)

O'DONNELL, J.

{¶ 1} Grace Cathedral, Inc., filed claims for tax exemption, one, pursuant to R.C. 5709.07(A)(2)—houses of public worship, and the other, pursuant to R.C. 5709.12(B)—property used for charitable purposes, in connection with a recently constructed building located on a parcel of land that had been exempted as necessary for the proper occupancy, use, and enjoyment of the preexisting church building on the same parcel. Although originally intended to form part of an onsite Bible college, the building was repurposed when the church decided to conduct the Bible college as an on-line operation. The record reflects that use of the building has been limited to providing transient lodging to congregants who visit the Akron area and desire to attend services at Grace Cathedral itself; additional religious activity associated with the worship in the church occurs in the building, such as fellowship and religious conversation, meditation, and learning.

{¶ 2} The tax commissioner denied Grace Cathedral's claimed exemptions and the Board of Tax Appeals ("BTA") upheld that determination. In its decision, regarding the claim of exemption under former R.C. 5709.07(A)(2) for houses devoted exclusively to public worship, the BTA applied the test we articulated in *Faith Fellowship Ministries, Inc. v. Limbach,* 32 Ohio St.3d 432, 437, 513 N.E.2d 1340 (1987), and held that the building failed to qualify as being " 'used in a principal, primary, and essential way to facilitate public worship.' " BTA No.

2012–2168, 2014 Ohio Tax LEXIS 963, *5 (Feb. 12, 2014). On appeal to this court, the church argues that the building's use in facilitating attendance at religious services qualifies for exemption under *Faith Fellowship Ministries,* given the circumstances of this case. We agree and therefore reverse the decision of the BTA. Because we allow the exemption for tax year 2010 under R.C. 5709.07(A)(2), the public worship exception, we do not reach the claim of exemption based on exclusive charitable use under R.C. 5709.12(B).

## FACTUAL BACKGROUND

{¶ 3} On September 30, 2010, Grace Cathedral filed its exemption application for the tax year 2010 pertaining to additional buildings added to an exempt church parcel "in order to increase Ministerial Training," and it identified "[t]he first building" as a "Dormitory which will be used to house those who are in the Ministerial Training Program." The other building was a "Study Hall for the Students."

{¶ 4} Responding to an inquiry from the tax department, Grace Cathedral Media Director and Finance Manager Catherine D. Shupe submitted a site plan with a letter dated April 20, 2011, stating that Grace Cathedral had "revised its plans for use for the buildings, and the buildings will not be used as part of a Ministerial Training Program." Specifically, the "Study Hall" would be repurposed as a location for religious education seminars and as a meeting area for members in conjunction with special worship services such as wedding and funeral services. Regarding the building at issue here, the letter stated, "The Dorm is made available to visitors in need of temporary housing, free of charge, while they visit the church to participate in worship services."

{¶ 5} These two new buildings, Shupe confirmed, are in addition to the building identified as the "existing" building on the site plan, which has been and is used as a church "in which weekly religious services are held." The site map shows that the dormitory building was constructed behind the study hall and the church building on a largely rectangular parcel, on which the larger church edifice is the main building that fronts on the street.

{¶ 6} On May 11, 2012, the tax commissioner issued a final determination. The commissioner found that the study hall was "used for religious educational seminars and a meeting area for church members," with the result that its "use qualifies for exemption pursuant to R.C. 5709.07." By contrast, "the building designated as a 'dormitory' is used as temporary housing for visitors who attend services of the church," and pursuant to "[t]he general rule in Ohio * * * that residential property is not exempt from taxation," the commissioner denied exemption. The commissioner also reviewed the application under the claim of exemption for charitable use and found that the case law prohibited the grant of exemption based on residential use of the property.

{¶ 7} Grace Cathedral appealed to the BTA, which held a hearing on September 16, 2013. It presented testimony from Paul Machamer and Catherine Shupe, which established that there are two Grace Cathedral church locations in Summit County: the property at issue and another located in Cuyahoga Falls. Regular services are held at both locations. Special events include "camp meeting" weekends and a baptismal service once a year. Attendance on site at the church services was estimated at over 1,000 weekly.

{¶ 8} Because the congregation's leader, the Reverend Ernest Angley, travels and conducts a television ministry, Grace Cathedral has members and supporters throughout the country and elsewhere in the world, some of whom come to Akron to attend live services. The dormitory building provides lodging for a weekend or for a full week encompassing two weekends. This use occurs on about 40 to 50 percent of the weekends during a year. When not so used, the building is used for religious services and related study classes, apparently on an ad hoc basis.

{¶ 9} In its decision issued February 12, 2014, the BTA acknowledged Grace Cathedral's argument that the dormitory is not a "residence" but rather " 'directly and primarily provides for the proper occupancy, use, and enjoyment of the church for public worship' " by analogy with the church's parking lot. BTA No. 2012–2168, 2014 Ohio Tax LEXIS 963, *3–4 (Feb. 12, 2014). But the BTA concluded that the use of the dormitory did not satisfy the standard set forth in the case law that the property must be used " 'in a principal, primary, and essential way to facilitate * * * public worship.' " *Id.*, *5, quoting *Faith Fellowship Ministries*, 32 Ohio St.3d at 437, 513 N.E.2d 1340.

{¶ 10} The BTA ruled that uses of property that are " 'merely supportive' " of worship do not qualify for the house-of-public-worship exemption. *Id.*, quoting *Faith Fellowship Ministries* at 436. Two circumstances led the BTA to conclude that the dormitory's use was "merely supportive." First, the dormitory was used primarily on weekends to house out-of-town visitors who came to participate in regular church services or special weekend worship events, which take place about six times a year. Second, the property was vacant approximately 50 to 60 percent of the time. Because of these circumstances, the BTA concluded that the dormitory use was "merely supportive" of the public worship at Grace Cathedral itself and it therefore did not qualify the building for exemption under R.C. 5709.07(A)(2).

{¶ 11} The BTA further addressed the claim of exclusive charitable use under R.C. 5709.12(B) and found that although "the record contains evidence that appellant does charitable work throughout the world," there was "insufficient evidence that the subject property is used in furtherance of its charitable purposes." It also relied on the court's decision in *Church of God in N. Ohio, Inc. v. Levin*, 124 Ohio St.3d 36, 2009-Ohio-5939, 918 N.E.2d 981, for the principle

that a use of property ancillary to and supportive of public worship does not typically qualify as a charitable use. *Id.*, *6–8. The BTA therefore affirmed the commissioner's denial of exemption for the dormitory building.

{¶ 12} Grace Cathedral has appealed the decision of the BTA to this court.

## ARGUMENTS OF THE PARTIES

{¶ 13} Grace Cathedral presents two propositions of law: one claiming entitlement to the house-of-public-worship exemption under R.C. 5709.07(A) and one asserting a right to the exemption for property used exclusively for charitable purposes under R.C. 5709.12(B). Because the public worship exemption applies and is dispositive of this appeal, we shall address it initially and deem it unnecessary to consider the other exemption claim advanced by Grace Cathedral.

{¶ 14} In support of its public-worship exemption claim pursuant to R.C. 5709.07(A)(2), which provides exemption for "[h]ouses used exclusively for public worship * * * and the ground attached to them * * * that is necessary for their proper occupancy, use, and enjoyment," Grace Cathedral maintains that the building provides "an extension of the worship experience and is utilized in continuing fellowship, religious discussion and religious learning." Moreover, Grace Cathedral argues that "keeping out-of-town visitors on the Grace Cathedral campus during their stay promotes fellowship among the church members and clergy and maximizes the opportunity for visitors to attend all church services and events during their visit."

{¶ 15} In opposition, the tax commissioner urges that the case law declines to extend the public worship exemption to residential use of property, including cases that view the provision of overnight lodging as a "functional equivalent" of residential use for purposes of denying exemption. *See Gerke v. Purcell*, 25 Ohio St. 229 (1874); *Faith Fellowship Ministries*, 32 Ohio St.3d 432, 513 N.E.2d 1340; *Moraine Hts. Baptist Church v. Kinney*, 12 Ohio St.3d 134, 465 N.E.2d 1281 (1984).

## STANDARD OF REVIEW

{¶ 16} Our review of BTA decisions is to determine whether they are reasonable and lawful. *See* R.C. 5717.04. The standard for conducting that review ranges from abuse of discretion, which applies when we are asked to reverse the BTA's determination regarding credibility of witnesses, to de novo review of legal issues. *Compare EOP–BP Tower, L.L.C. v. Cuyahoga Cty. Bd. of Revision*, 106 Ohio St.3d 1, 2005-Ohio-3096, 829 N.E.2d 686, ¶ 14, *with Akron Centre Plaza, L.L.C. v. Summit Cty. Bd. of Revision*, 128 Ohio St.3d 145, 2010-Ohio-5035, 942 N.E.2d 1054, ¶ 10. This appeal presents primarily a question of law for our plenary review, *see Equity Dublin Assocs. v. Testa*, 142 Ohio St.3d 152, 2014-Ohio-5243, 28 N.E.3d 1206, ¶ 22, and we recognize that this court defers to the

BTA with respect to factual findings, *Satullo v. Wilkins*, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14, citing *Columbus City School Dist. Bd. of Edn. v. Zaino*, 90 Ohio St.3d 496, 497, 739 N.E.2d 783 (2001).

## PUBLIC WORSHIP EXEMPTION

{¶ 17} R.C. 5709.07(A)(2) exempts "[h]ouses used exclusively for public worship, the books and furniture in them, and the ground attached to them that is not leased or otherwise used with a view to profit and that is necessary for their proper occupancy, use, and enjoyment."

### *Incidental Use*

{¶ 18} Our case law provides a dispositive resolution of the exemption claim presented in this appeal: the test we formulated in *In re Bond Hill–Roselawn Hebrew School*, 151 Ohio St. 70, 84 N.E.2d 270 (1949), approved in *Bishop v. Kinney*, 2 Ohio St.3d 52, 442 N.E.2d 764 (1982), which focuses on the primary use of the premises, holds that incidental uses of church property will not defeat a public worship exemption when the primary use of the property is public worship.

{¶ 19} In *Bond Hill* for example, the building at issue was a 1½ story structure with the 120–seat church on the first floor and three rooms upstairs. The upstairs rooms were used as a residence by the caretaker and his family. We observed:

> Some care of a building is necessary in order that it may be used. Provision for such care may require that the caretaker reside on the premises. The fact that he does, that his wife also helps in the work, and that their child lives with them should clearly not detract from the fact that the building is used exclusively for public worship. Such a use is not only definitely incidental to the primary use of the building for public worship but also is merely an element in making that use possible.

*Bond Hill* at 74–75.

{¶ 20} In *Bishop v. Kinney*, a multipurpose building had a church, an administrative office, and the housekeeper's residence on the first floor. On the second floor was the priest's residence. In the basement were three classrooms, a furnace room, and a parish hall. Exemption had been granted for the church and the administrative office on the first floor and the classrooms in the basement.

{¶ 21} The issue on appeal there related to the parish hall, where activities included regular religion classes, religion-related training and curriculum workshops, retreats, a summer Bible school, regular fellowship activities, and weekly bingo games. Relying on *Bond Hill*, we held the parish hall tax exempt.

Significantly, following *Bond Hill*, the legislature enacted R.C. 5713.04, allowing a single parcel—or a single building on a parcel—to be "split listed" between taxable and exempt uses. In *Bishop v. Kinney*, we held that the rationale of *Bond Hill* was "equally applicable whether the focus of inquiry is the whole building, as in *Bond Hill*, or a portion thereof as now authorized by the split-listing statute. Moreover, decisions rendered since the enactment of R.C. 5713.04 have not abandoned the primary-use test * * *." 2 Ohio St.3d at 53, 442 N.E.2d 764.

{¶ 22} Applying *Bishop v. Kinney* to this case, the separate dormitory building on the church's parcel in this case would be exempt if its primary use is for public worship or incidental to the primary use of the property for public worship and is an element in making that use possible. We have, however, clarified this test in later cases by allowing an exemption when the ancillary use was found to facilitate public worship in a "principal, primary, and essential way," rather than being "merely supportive" of but "incidental to" it. *Faith Fellowship Ministries*, 32 Ohio St.3d at 437, 513 N.E.2d 1340.

### Inapposite Case Authority

{¶ 23} The tax commissioner relies on well-settled, but inapposite, authority to the effect that residential use of property defeats a claim of exemption under the public-worship provision. Thus, in *Gerke*, 25 Ohio St. 229, we held that the parsonages located on ground adjacent to the churches themselves could not qualify for the exemption because "[t]he ground in such case is appropriated to a new and different use" from that of worship, namely, a "place of private residence" for the day-to-day use by the clergy. *Id.* at paragraph ten of the syllabus. *Accord Watterson v. Halliday*, 77 Ohio St. 150, 82 N.E. 962 (1907) ("parish houses" that are *residences of the priests* also do not qualify for exemption as institutions of purely public charity); *Full Gospel Apostolic Church v. Limbach*, 46 Ohio St.3d 195, 546 N.E.2d 403 (1989) (affirming denial of exemption for parsonage and vacant land in the context of approving exemption for other portions of the property). The property here is not a parsonage, as it is not a residence for clergy.

{¶ 24} The BTA here acknowledged that "the property was not used as a 'permanent' residence by the individuals attending appellant's services," but held that the use was "merely supportive of public worship" and did not, as a consequence, qualify the building for exemption. BTA No. 2012–2168, 2014 Ohio Tax LEXIS 963, *5. In defending its holding, the tax commissioner relies on four cases: *Moraine Hts.*, 12 Ohio St.3d 134, 136, 465 N.E.2d 1281 (overnight facilities for boys and girls at church camp not exempt); *Faith Fellowship Ministries*, 32 Ohio St.3d at 437 (affirming denial of exemption for 12 sleeping rooms that, along with associated building space, were used for church retreats);

*Christian Church of Ohio v. Limbach,* 53 Ohio St.3d 270, 560 N.E.2d 199 (1990) (denominational administrative building not exempt); and *Church of God in N. Ohio,* 124 Ohio St.3d 36, 2009-Ohio-5939, 918 N.E.2d 981 (same).

{¶ 25} Those cases do not provide controlling precedent to resolve the instant matter. The first two involve sleeping quarters, as does the dormitory building in the present case. But each of them differs from the present case in this respect: the overnight accommodation in those cases facilitated attendance at a church *camp* (*Moraine Hts.*) or at a church *retreat* (*Faith Fellowship Ministries*), rather than facilitating attendance *at the public worship service of the church itself.*[1] In addition, this dormitory provides a location and atmosphere to facilitate the worship through continued discussion and fellowship.

{¶ 26} The other two cases are more remote from the circumstances presented here. Both *Christian Church* and *Church of God in N. Ohio* involve office buildings separate from church facilities that were used to coordinate activities of a number of congregations from an administrative standpoint. The administrative use of property in those cases was "merely supportive" of public worship; by contrast, the overnight lodging for congregants on the church's own property facilitates public worship in the "principal, primary, and essential way" that qualifies the property for exemption.

{¶ 27} The BTA relied in part on the fact that the building apparently is unused 50 to 60 percent of the time during the year as part of its justification to deny the claimed exemption. BTA No. 2012–2168, 2014 Ohio Tax LEXIS 963, *5–6. The criterion for establishing the taxable or exempt status of the building is its use, not the percentage of all time during the year that it is in use. Here, the status of the building must be determined in light of its use, and exemption should not be denied merely because it is not used more often during the year. The record here also suggests that providing lodging for visiting congregants occurs primarily on and over the weekend, coordinated with the worship services, and actually does facilitate public worship in a principal, primary, and essential way that qualifies for the exemption.

{¶ 28} Like on-site church parking lots, which facilitate public worship and are used only at times of worship and which routinely qualify for exemption pursuant to R.C. 5709.07(A)(2), the on-site dormitory here facilitates public worship by affording congregants proximity to attend church services and an opportunity for fellowship following services. *See Greater Life Assembly, Inc. v. Zaino,* BTA No.

---

1. As the tax commissioner points out, the General Assembly responded to *Moraine Hts.* and *Faith Fellowship Ministries* by enacting a tax exemption for church camps and church retreats, now codified at R.C. 5709.07(A)(3). Am.S.B. No. 71, 142 Ohio Laws, Part I, 147–150 (1988).

2002–A–878, 2003 WL 123666, \*2 (Jan. 10, 2003) (tax commissioner determined a church building and seven acre part of the church's property used for a driveway, parking lots, and grounds qualified for exemption pursuant to R.C. 5709.07(A)(2)); *Columbus City School Dist. Bd. of Edn. v. Tracy*, BTA No. 97–J–285, 1998 WL 741918, \*3 (Oct. 16, 1998). However, the dissent denies that the dormitory facilities public worship by congregants who may otherwise be unable to take advantage of the services and that fellowship, which is part of the religious experience, occurs in the dormitory itself and further facilitates public worship.

{¶ 29} It also vigorously denies the distinction between the use of a building as temporary lodging so that out of town visitors can attend church services and the use of a building as a private, permanent residence for a religious leader. It simply ignores the fact that the cases in which we denied exemption to temporary sleeping quarters dealt with church camps and retreats. *See Faith Fellowship Ministries*, 32 Ohio St.3d at 433, 513 N.E.2d 1340; *Moraine Hts.*, 12 Ohio St.3d at 134, 465 N.E.2d 1281. By contrast, this case involves temporary lodging on the ground attached to a house of public worship that is necessary for the proper use of the church to facilitate attendance at the church.

{¶ 30} The dissent further focuses on the BTA's factual finding that "very little public worship occurs" in the dormitory itself and on the number of Grace Cathedral's congregants who use the dormitory. BTA No. 2012–2168, 2014 Ohio Tax LEXIS 963, \*6. This position is not well taken, because pursuant to R.C. 5709.07(A)(2), it is not necessary that a specified number of services of public worship occur in the dormitory, nor does the statute specify that a specific number of congregants require use of the property to attend services. Rather, the dormitory need only facilitate public worship in a "principal, primary, and essential way" or provide a use incidental to the primary use, and it does just that.

## CHARITABLE PURPOSE EXEMPTION

{¶ 31} Grace Cathedral also asserts a second position that the dormitory is exempt under R.C. 5709.12(B), which removes from taxation "[r]eal and tangible personal property belonging to institutions that is used exclusively for charitable purposes." Our disposition of the claim of exemption under the public worship exemption obviates the need for us to address this claim.

## CONCLUSION

{¶ 32} The Grace Cathedral claim that the dormitory building qualifies for exemption as being used in a principal, primary, and essential way to facilitate public worship is well taken. The decision of the BTA is reversed, and the

exemption is allowed for tax year 2010 in accordance with the application filed in this case.

Decision reversed.

PFEIFER, KENNEDY, and FRENCH, JJ., concur.

O'CONNOR, C.J., and LANZINGER and O'NEILL, JJ., dissent.

_____

**O'CONNOR, C.J., dissenting.**

{¶ 33} When reviewing a decision from the Board of Tax Appeals, we must defer to the factual findings of the BTA, strictly construe exemptions from real property taxation, maintain the burden on the taxpayer to establish a clear right to the exemption, and construe the language of any given statute in conformity with controlling precedent. The majority has failed to meet any of these basic obligations in reaching its conclusion that the dormitory building owned by Grace Cathedral, Inc., qualifies for a tax exemption.

{¶ 34} The dormitory at issue in this case is essentially a free hotel. It has approximately 23 bedrooms available to out-of-town visitors who might wish to join thousands of other people in attendance at public worship services in Grace Cathedral's church, which is in a separate building already exempt from taxation.

{¶ 35} Whether the dormitory functions as a place of permanent versus temporary housing is irrelevant; in either case it is not essential to the functioning of the church or the public worship that occurs in the church. And contrary to one of the many misstatements in the majority opinion, the dormitory building does not somehow provide "religious services * * * on an ad hoc basis," majority opinion at ¶ 8, just because a prie-dieu is available to use for personal prayer in the common area at the front of the building. The dormitory in this case is not a house used exclusively for public worship and therefore does not qualify for exemption from real property taxation under R.C. 5709.07(A)(2).

{¶ 36} I must therefore dissent.

### RELEVANT HISTORY

{¶ 37} Given the leaps of faith the majority takes with the record and the BTA's findings, it is necessary to spend some more time on the facts presented to the tax commissioner of Ohio and the BTA and the findings and conclusions made by the BTA regarding the applicability of R.C. 5709.07(A)(2) to the dormitory.

{¶ 38} In 2010, Grace Cathedral, Inc., filed an application with the Summit County auditor, seeking a tax exemption for the dormitory building it had recently constructed on its 14–acre property in Akron, Ohio. Grace Cathedral stated in its tax-exemption application that the dormitory would be used to house

students participating in a free ministerial training program. That program did not come to be.

{¶ 39} During the pendency of the application process, Catherine D. Shupe, the secretary and finance manager of Grace Cathedral, informed the tax commissioner that the dormitory building had been repurposed and would be used for "visitors in need of temporary housing, free of charge, while they visit the church to participate in worship services." No other information about the dormitory building was provided in the record of proceedings before the tax commissioner.

{¶ 40} The tax commissioner determined that a building used for temporary housing constituted residential property and rejected the application for an exemption under R.C. 5709.07(A)(2) pursuant to longstanding precedent from this court, including *Watterson v. Halliday*, 77 Ohio St. 150, 82 N.E. 962 (1907) (church-owned residences do not constitute property used exclusively for public worship).

{¶ 41} In its notice of appeal from the tax commissioner's decision, Grace Cathedral's sole argument was that the temporary nature of the housing was a dispositive distinction from *Watterson* and other cases denying religious tax exemptions for buildings used as residences.

{¶ 42} At the hearing before the BTA, Grace Cathedral presented the testimony of two witnesses: Shupe, the finance manager, and Russell Machamer, the chief pilot of the Boeing 747 jumbo jet airplane owned by Grace Cathedral. The witnesses reiterated the statement by counsel that the primary purpose of the dormitory was to provide temporary housing for out-of-town visitors coming to participate in worship services at the church.

{¶ 43} Machamer explained that the two-story, 23–bedroom dormitory was built during the planning stages of an on-site Bible college and was intended to house students from all over the world. But after it was determined that the project would be too expensive and fraught with immigration difficulties, that plan was abandoned. Instead, Grace Cathedral established an online Bible college and decided to use the dormitory as temporary housing for visitors to the church, as well as those coming to meet with Reverend Angley or other church leaders, and visiting Bible-study instructors.

{¶ 44} Machamer stated that out-of-town visitors come to the church on some weekends, and he estimated that the dormitory is used to house one or more visitors during no more than half of the weekends of the year. Then the visitors staying in one or more of the 23 dormitory rooms would attend church services with the 1,000 to 2,000 people that regularly attend church services on any given weekend.

{¶ 45} Shupe testified that the church was glad to offer the dormitory as a way to ease the financial burden on those traveling from out of town to participate in church services. Shupe admitted that visitors would likely come to the church even if the dormitory did not exist, staying in a hotel room.

{¶ 46} Shupe also testified that the visitors who come to stay at the dormitory are "given an opportunity" to donate to the church, though it is not required. Additionally, visitors are made aware that they can eat at a restaurant that is operated by one of Grace Cathedral's for-profit companies, located down the road in nearby Cuyahoga Falls, Ohio.

{¶ 47} Machamer testified that in addition to the 23 bedrooms, there was one room near the entrance of the dormitory that is available for common use if the dormitory is occupied. It is in this room, the majority claims, that "religious activity" occurs "such as fellowship and religious conversation, meditation, and learning." Majority opinion at ¶ 1. It is also on the basis of Machamer's description of this room that the majority claims that when the dormitory is not used as temporary lodging, "the building is used for religious services and related study classes, apparently on an ad hoc basis." Majority opinion at ¶ 8. And again, it is on the basis of the same description that the majority claims that the "dormitory provides a location and atmosphere to facilitate the worship [at the church] through continued discussion and fellowship." Majority opinion at ¶ 25. The actual facts described in Machamer's testimony paint quite a different picture.

{¶ 48} Machamer testified that the room contains the following items: (1) "[A] small altar for one person. *If they want to pray or continue their worship*, they at least have an option to do that." (Emphasis added.) The altar was described as being the width of a person's shoulders, with a padded kneeling bench. (2) "[B]oxes of books, some rows of books, and tables of magazines," specifically identified as "several copies of each" of the more than 33 books authored by Reverend Angley and used as reference books for the online Bible college. (3) "[T]ables and shelves" for visitors "*if they want to worship or study* because the other two buildings [the church and study hall building] are closed after hours." (Emphasis added.)

{¶ 49} Machamer's testimony certainly describes objects that provide the *opportunity* for worship in the common room of the dormitory and could perhaps support the inference that some ad hoc worship might occur. But the record does not come close to establishing that the dormitory is essential to a place of public worship, nor does it support the inferences drawn by the majority. More importantly, the majority's emphasis on this portion of Machamer's testimony goes directly against the BTA's finding that "[a]lthough * * * people are *able* to continue their worship or studies in the building when other facilities are not available, the record indicates that very little public worship occurs on the

property." (Emphasis added.) BTA No. 2012–2168, 2014 Ohio Tax LEXIS 963, *5–6.

{¶ 50} After the evidentiary hearing, Grace Cathedral provided a brief in support of its cause, in which it reiterated that the primary purpose of the dormitory was to temporarily house out-of-town visitors who come to visit the church. Grace Cathedral stressed that on "[m]ost nights throughout the year, particularly weeknights, the Dormitory is completely vacant," in order to support its argument that "[n]o church member, church employee, or other person resides at the Dormitory" and that the tax commissioner's analogy to residential property was therefore unfounded.

{¶ 51} In its decision, the BTA acknowledged Grace Cathedral's argument by noting that the dormitory is used as temporary housing during weekends and is otherwise vacant over half of the time. BTA No. 2012–2168, 2014 Ohio Tax LEXIS 963, *5–6. And the BTA agreed that Grace Cathedral had established, through these facts, that the dormitory was not used as a permanent residence. The BTA in no way used the periodic vacancy of the building to support its conclusion. The majority plainly misrepresents the BTA's decision in this respect.

{¶ 52} In its actual analysis, the BTA noted that in order to qualify for a tax exemption as property used exclusively for public worship, the property cannot be "merely supportive" of public worship and instead " 'must be used in a principal, primary, and essential way to facilitate public worship.' " *Id.* at *4, quoting *Faith Fellowship Ministries, Inc. v. Limbach,* 32 Ohio St.3d 432, 437, 513 N.E.2d 1340 (1987). The BTA found that "very little public worship occurs on the property" and correctly held that the dormitory's use as temporary housing was "merely supportive of public worship" at Grace Cathedral. *Id.* at *6. The BTA concluded that the dormitory did not qualify for the tax exemption available to houses used exclusively for public worship. *Id.*

{¶ 53} Grace Cathedral's appeal to this court regarding R.C. 5709.07(A)(2) again argues that this court's precedent denying religious tax exemptions for residential buildings is inapplicable to temporary housing. The church also argues that the dormitory building "principally and essentially encourages and facilitates public worship" because it allows visitors who might not be able to afford a hotel room to come to the church. Finally, it presents a new argument that "[t]he Dormitory is effectively used for religious retreats in that people make pilgrimages to Grace Cathedral to hear Reverend Angley's and Grace Cathedral's message live and in person" and therefore qualifies for an exemption as a "religious retreat" pursuant to *Round Lake Christian Assembly, Inc. v. Commr. of Tax Equalization,* 4 Ohio App.3d 189, 447 N.E.2d 132 (5th Dist.1982). Not one of these arguments is supported by the record, and all are contrary to settled law.

ANALYSIS

{¶ 54} This court's review of a decision of the BTA is limited to a determination of whether the decision is reasonable and lawful. R.C. 5717.04. If the findings made by the BTA are supported by sufficient probative evidence in the record, we must abide by these findings and cannot review the facts de novo. *Hawthorn Mellody, Inc. v. Lindley*, 65 Ohio St.2d 47, 417 N.E.2d 1257 (1981). It is not our place to reweigh the evidence, either to breathe new life into facts we think were not given adequate weight or to discount facts that we think were overemphasized. *Moraine Hts. Baptist Church v. Kinney*, 12 Ohio St.3d 134, 136, 465 N.E.2d 1281 (1984).

{¶ 55} With due deference given to the BTA's findings, the facts in this case are simple. The dormitory is primarily used for temporary housing. The objective behind this primary use is to reduce the costs of travel and thereby encourage out-of-town visitors to attend the public worship that occurs in the separate church building. It is absurd to reject the BTA's finding that the dormitory's primary use was temporary housing rather than public worship, given that Grace Cathedral itself repeatedly emphasized these same facts in support of its application. The majority's attempt to undermine the BTA's findings by characterizing the dormitory as a place of "religious activity" and "religious services" is just as unsupported by the law as it is unsupported by the record before us. In fact, the majority concedes as much by relying on what the record "suggests" rather than what it supports. Majority opinion at ¶ 27.

{¶ 56} Because the findings of the BTA are supported by sufficient probative evidence, the only task that remains is to determine whether the temporary housing provided by Grace Cathedral makes the dormitory eligible for an exemption from real property tax as a matter of law.

{¶ 57} Since the early days of Ohio's existence as a state, we have held that "all laws that exempt any of the property of the community from taxation should receive a strict construction. All such laws are in derogation of equal rights." *Cincinnati College v. State*, 19 Ohio 110, 115 (1850). The statutory limitations on tax exemptions in R.C. Chapter 5709 were carefully and precisely worded by the General Assembly "so that the right of exemption conferred would not be abused or unduly enlarged, and such restrictions are essential to a fair and equitable sharing in the burdens of taxation." *Watterson v. Halliday*, 77 Ohio St. at 171, 82 N.E. 962. The reason for allowing certain entities to carry a lesser burden of property taxation is that their use of the property is deemed to provide a benefit to the community "that justifies the loss of the tax revenue." *Case W. Res. Univ. v. Wilkins*, 105 Ohio St.3d 276, 2005-Ohio-1649, 825 N.E.2d 146, ¶ 12.

{¶ 58} Because exemptions are generally in derogation of the rights of all other taxpayers in the community, and because every exemption has been provided

solely through legislative grace, statutory language must be "construed against the exemption, meaning that the onus is on the taxpayer to show that the language of the statute 'clearly express[es] the exemption' in relation to the facts of the claim." *Anderson/Maltbie Partnership v. Levin,* 127 Ohio St.3d 178, 2010-Ohio-4904, 937 N.E.2d 547, ¶ 16, quoting *Ares, Inc. v. Limbach,* 51 Ohio St.3d 102, 104, 554 N.E.2d 1310 (1990). Thus the burden is on Grace Cathedral to establish that a tax-exemption provision applies to the facts of its claim and that it clearly expresses an exemption for those facts.

{¶ 59} The statutory language to be construed is as follows:

> (A) The following property shall be exempt from taxation:
>
> \* \* \*
>
> (2) Houses used *exclusively* for public worship, the books and furniture in them, and the ground attached to them that is not leased or otherwise used with a view to profit and that is *necessary* for their proper occupancy, use, and enjoyment.

(Emphasis added.) R.C. 5709.07(A)(2). We have previously taken note of the repeated use of words such as "exclusively" and "necessary" in this and other portions of R.C. 5709.07 and concluded that their frequent use evidenced the legislative intent that they "should be given special consideration when the right to exemption of property is presented for decision." *Watterson v. Halliday,* 77 Ohio St. at 173, 82 N.E. 962.

{¶ 60} Grace Cathedral has been very straightforward and consistent in stating that the dormitory is used for temporary housing for people visiting the church from out of town during weekends. Thus the dormitory itself is not a "[h]ouse[ ] used exclusively for public worship." The only remaining way for Grace Cathedral to establish that the decision of the BTA and the determination of the tax commissioner should be overturned is to show that the use of the dormitory is "necessary for [the] proper occupancy, use, and enjoyment" of the church. To qualify for an exemption under this standard, Grace Cathedral must satisfy the primary-use test, which dictates that the "property must be used in a principal, primary, and essential way to facilitate the public worship." *Faith Fellowship Ministries,* 32 Ohio St.3d 432, 513 N.E.2d 1340, paragraph two of the syllabus.

{¶ 61} As noted above, Grace Cathedral presents three main arguments: (1) the dormitory principally facilitates public worship by housing visitors who might not be able to afford a hotel room to come to the church, (2) the dormitory is not used as a residence, and (3) the dormitory should be considered a religious retreat. All of these arguments lack merit.

{¶ 62} *Faith Fellowship Ministries* offers an excellent example of a building that is not used for public worship but is nonetheless deemed essential to the public worship occurring in other buildings: a building dedicated to essential heating equipment for church property. *Id.* at 437. Although the building also provided heat to certain portions of the property that were not exempt, we held:

> It is profoundly clear that the public worship which was conducted in the exempt portions of appellant's complex would not have occurred had they not had enough heat to render them comfortable. We regard the boilers as essential to the public worship use of the complex and, consequently, the building which housed the boilers to be exempt under the primary-use test.

*Id.* at 437–438. And as the majority notes, it is also arguable that a parking lot is a good example of property that is necessary for the proper use, occupancy, and enjoyment of a church, though this court has never spoken directly on the issue. *See Greater Life Assembly, Inc. v. Zaino,* BTA No. 2002–A–878, 2003 WL 123666, *2 (Jan. 10, 2003). But in analyzing substantially similar statutory language regarding property "used exclusively for charitable purposes," R.C. 5709.12(B), we have repeatedly found parking facilities to be integral to the functioning of larger institutions. *Good Samaritan Hosp. of Dayton v. Porterfield,* 29 Ohio St.2d 25, 29, 278 N.E.2d 26 (1972); *Bowers v. Akron City Hosp.,* 16 Ohio St.2d 94, 96, 243 N.E.2d 95 (1968). Not having parking available near a large institution, such as a hospital or church, would require the institution's many visitors to travel on foot or by some other means. And just as it would be unreasonable to expect a church congregation to endure freezing temperatures in order to engage in public worship, it would be unreasonable to expect church-goers to travel to their place of worship without the use of their cars. Because the absence of parking facilities would essentially render a church inaccessible, this court would likely find such parking facilities to be exempt under the primary-use test as applied in *Faith Fellowship* at 437–438.

{¶ 63} Conversely, property that merely supports public worship through secondary or ancillary activities is not exempt. *Id.* at 436. Examples include offices for the management of church affairs, *Church of God in N. Ohio, Inc. v. Levin,* 124 Ohio St.3d 36, 2009-Ohio-5939, 918 N.E.2d 981, ¶ 22, and housing for essential church employees, *Watterson v. Halliday,* 77 Ohio St. 150, 82 N.E. 962; *Gerke v. Purcell,* 25 Ohio St. 229 (1874). These examples of exempt and nonexempt properties make it clear that in order to be principal, primary, and essential to the facilitation of public worship, the use of the property must not

only have the ultimate objective of facilitating public worship, but it must also be directly necessary to the public worship.

{¶ 64} Everything owned by Grace Cathedral is arguably used with the objective of promoting or facilitating public worship. Even the church's Boeing 747 is likely used with this objective. But the desire to facilitate public worship is not the end of the inquiry under *Faith Fellowship Ministries*. Otherwise, all of Grace Cathedral's property, and indeed any property involving or related to religious activity, would be exempt from taxation. Instead, Grace Cathedral must show that the dormitory is used in way that is principal, primary, and essential to the public worship within the church building.

{¶ 65} The dormitory was built to provide residential housing for students at an on-site college that never came to be; it was not built because overnight housing was needed for Grace Cathedral to be able to accommodate public worship. During the weekends when the dormitory is being used, somewhere between one and 23 individuals or families would join the 1,000 to 2,000 other members of the church congregation in worship at the separate church building. Given that no more than a tiny fraction of Grace Cathedral's congregation uses the dormitory at any given point, it cannot be said that attendance at public worship could not occur but for the use of the dormitory, and thus it is in no way analogous to the provision of essential heating or parking facilities. Moreover, those staying at the dormitory would otherwise have the option of staying at an Akron hotel and would be likely to visit the church even if free overnight accommodations were not provided.

{¶ 66} For all of these reasons, the majority should have rejected Grace Cathedral's argument that the dormitory principally facilitates public worship by providing free accommodations for out-of-town visitors who might find it difficult to afford a hotel room. And it should have accepted the BTA's well-supported findings to the contrary.

{¶ 67} Next, the use of the dormitory does not somehow become "principal, primary, and essential" for public worship through a showing that it is a place of temporary housing rather than a permanent residence. It makes no difference whether one person called the dormitory home for 365 nights of a year or 365 people each called the dormitory home for one night. In either scenario the use is merely supportive of the public worship that occurs in the church building, and not directly essential to public worship. Accordingly, it remains true that the provision of any kind of housing that is not directly essential to the occurrence of public worship is not eligible for an exemption under R.C. 5709.07(A)(2). *Watterson; Gerke*. The majority's attempt to avoid the application of our own well-established precedent is based on an irrelevant distinction. The majority therefore should have rejected Grace Cathedral's argument on this point.

{¶ 68} And thirdly, Grace Cathedral's argument based on *Round Lake Christian Assembly* lacks merit. In *Round Lake,* the Fifth District Court of Appeals held that lodging provided at a church camp qualified for the exemption for "houses used exclusively for public worship." *Id.,* 4 Ohio App.3d at 195, 447 N.E.2d 132. The court reasoned that such lodging was necessary to the use of the religious facilities at the camp because it was located in the wilderness. In other words, public worship could not have happened but for the lodging provided. Grace Cathedral's location in a city, and not the wilderness, makes *Round Lake* inapposite to its claim. Moreover, we have definitively held that religious camps do not qualify as houses used exclusively for public worship. *Moraine Hts. Baptist Church v. Kinney,* 12 Ohio St.3d at 137, 465 N.E.2d 1281.

{¶ 69} As the majority recognizes, the General Assembly has since enacted R.C. 5709.07(A)(3), which provides an exemption for "[r]eal property owned and operated by a church that is used primarily for church retreats or church camping, and that is not used as a permanent residence." Thus it is true that religious retreats now qualify for property tax exemptions. But it is also still true that religious retreats do not qualify for the specific tax exemption provided to "[h]ouses used exclusively for public worship" under R.C. 5709.07(A)(2).

{¶ 70} Grace Cathedral has not claimed eligibility for an exemption under R.C. 5709.07(A)(3) at any point. Further, its factual allegation that the dormitory is a "religious retreat" for those making "pilgrimages" to Grace Cathedral was raised for the first time in its brief to this court. The issue was not presented to the tax commissioner, nor was it considered by the BTA. Grace Cathedral's failure to have done so waives the argument to this court. *HealthSouth Corp. v. Levin,* 121 Ohio St.3d 282, 2009-Ohio-584, 903 N.E.2d 1179, ¶ 18, fn. 2, and this court will "not consider any matter not presented to the Board of Tax Appeals." *Neil House Hotel Co. v. Franklin Cty. Bd. of Revision,* 147 Ohio St. 231, 70 N.E.2d 646 (1946), paragraph one of the syllabus. The majority therefore should have summarily rejected Grace Cathedral's argument that the dormitory was eligible for a tax exemption because it constituted a religious retreat.

{¶ 71} Finally, not only does the majority fail to reject Grace Cathedral's arguments, it fails to analyze them altogether. Instead, it focuses on rejecting the "inapposite" case authority provided by the tax commissioner, such as *Moraine Hts.* and *Church of God in N. Ohio.* Majority Opinion at ¶ 23. Further, it adds factual embellishments from what the record "suggests," in order to portray the dormitory as supplementing or serving as an extension of the public worship. Majority opinion at ¶ 27–28. And it anchors its analysis by fabricating and then rejecting the BTA's supposed holding that the failure to use the dormitory 100 percent of the time rendered it ineligible for a tax exemption

under R.C. 5709.07(A)(2). Majority opinion at ¶ 27. Because these sua sponte arguments on behalf of Grace Cathedral fail to establish that the dormitory falls within the category of "[h]ouses used exclusively for public worship" or "necessary for their proper occupancy, use, and enjoyment" under R.C. 5709.07(A)(2) and do violence to the most basic standards of review, they should not have attracted a majority of the court.

## CONCLUSION

{¶ 72} It is telling that the majority opinion provides no substantive analysis of Grace Cathedral's arguments and instead confines its discussion to a rejection of the tax commissioner's arguments; it has erroneously placed the burden on the tax commissioner to establish why Grace Cathedral's application should fail. Well-settled law demands that the burden be placed on Grace Cathedral to overcome a strict construction of the statute in favor of the public and against the taxpayer. Grace Cathedral has not carried its burden, even with the factual embellishments provided by the majority.

{¶ 73} R.C. 5709.07(A)(2) was neither unreasonably nor unlawfully construed by the BTA, and the findings of the BTA were supported by sufficient probative evidence. The board's decision should be affirmed, and I therefore dissent.

LANZINGER and O'NEILL, JJ., concur in the foregoing opinion.

————————

Roderick Linton Belfance, L.L.P., William G. Chris, and Brandon T. Pauley, for appellant.

Michael DeWine, Attorney General, and David D. Ebersole and Barton A. Hubbard, Assistant Attorneys General, for appellee.