Kennedy, J.
{¶ 1} This is an appeal from a decision of the Board of Tax Appeals (“BTA”) that affirmed the tax commissioner’s denial in 2011 of an exemption for real property located in Gahanna from which appellant, Christian Voice of Central Ohio, operates radio stations. Until 2007, Christian Voice operated the stations from offices located in New Albany. In 1991, the tax commissioner had granted an exemption for that property, reasoning that it was being “used for church purposes * * * under R.C. 5709.07.” In 2007, following the relocation of Christian Voice’s offices to Gahanna, a complaint was filed challenging the continued exemption of Christian Voice’s New Albany property. In a final determination issued in 2013, the tax commissioner denied the complaint, similarly reasoning that the property was “being used for church facilities.”
{¶ 2} Meanwhile, in 2008, Christian Voice applied for the same exemption for its Gahanna property that its New Albany property had enjoyed for 17 years. According to the application, a building constructed on the Gahanna property contains “production studios used for the origination of certain religious programming, offices, assembly rooms and a chapel.” Christian Voice again sought exemption under R.C. 5709.07(A)(2), which relieves “[hjouses used exclusively for public worship” and attendant lands from taxation. On this occasion, the tax commissioner denied the exemption, finding “no evidence that people assemble to worship together on the subject property” and reasoning that the exemption applies only “where people gather to profess their faith or to observe and participate in religious rituals or ceremonies.”
{¶ 3} On appeal from the BTA’s affirmance of the tax commissioner’s final determination, Christian Voice advances three arguments: the decision to deny the exemption is unreasonable and unlawful when the primary use of the *218 property is for public worship; the decision to ignore a property owner’s prior tax exemption violates the doctrine of collateral estoppel when no material facts or circumstances changed since the prior determination; and the decision to completely deny the exemption is unreasonable and unlawful because R.C. 5713.04 permits real property to be split into exempt and nonexempt parts if the part used in the exempt manner can be precisely delineated.
{¶ 4} We agree with Christian Voice’s first argument — that the primary use of the property is for public worship — and therefore reverse the decision of the BTA. Because we conclude that the BTA should have allowed the exemption under R.C. 5709.07(A)(2), the public-worship exemption, for the entire property, regardless of past determinations, we do not examine the second and third arguments asserted by Christian Voice.
Factual Background
{¶ 5} According to testimony presented at the BTA hearing on May 29, 2013, Christian Voice operates several[1] radio stations, including most prominently WCVO 104.9 FM, “The River.” The property at issue was acquired in May 2007 to replace Christian Voice’s prior New Albany offices.
{¶ 6} Christian Voice has had nonprofit status under 26 U.S.C. 501(c)(3) since it was established in 1964. There are no stockholders. According to Christian Voice’s 2008 exemption application, the Gahanna property is used to produce radio programming for the purpose of “furthering the gospel of Jesus Christ through Contemporary Christian Music and Preaching and Teaching radio programs.”
{¶ 7} The property is a 2.184-acre parcel improved with a 16,783-square-foot building built in 1998. Diagrams furnished by Christian Voice to the tax commissioner show two floors plus a basement. The basement consists primarily of a meeting room, the first floor contains a chapel and offices for administrative and program staff, and the second floor contains additional offices.
{¶ 8} According to testimony and recent financial statements introduced at the BTA hearing, Christian Voice’s primary sources of revenue are (1) funds received from underwriters in exchange for advertising and (2) donations. The former relates to the sale of airtime on The River. Bill Montgomery, The River’s chief sales officer, testified that the sale of advertising is vital to the ministry of the station. Daniel Baughman, president and chief executive officer, testified that *219 the station has “to generate that revenue ourselves. It takes money to do what we do to get the Gospel out there.”
{¶ 9} The advertising is limited by Federal Communications Commission regulations to mentions of the supporting businesses’ names and telephone numbers; advertisements may not state the prices of their services or products. Montgomery testified that the station does not air advertisements that promote alcohol, lotteries, casinos, or adult businesses such as nightclubs. Additionally, the content of advertising is monitored to ensure that it is appropriate for children to hear.
{¶ 10} About 95 percent of Christian Voice’s programming consists of Christian music and 5 percent of “talk.” Todd Stach, chief creative officer, described the music as “bible verses put to music,” explaining that artists convert old hymns into contemporary songs. He also stated that most of the songs “encourag[e] a vertical relationship with God.”
{¶ 11} The River’s talk segments consist of pastoral programming. John Moriarty — the station’s full-time pastor, known as Pastor John — records one-minute devotional spots with contact information, inviting listeners to contact him for prayer or support. The River’s disc jockeys (“DJs”) also promote Pastor John’s counseling services on the air. In addition, on Sunday mornings, The River airs a three-hour syndicated program called “Keep the Faith.” Although it includes music, the program is, according to Baughman’s testimony, as “close to preaching and teaching as you can be,” helping listeners “get through life[’s] struggles.”
{¶ 12} Christian Voice’s chapel features a collection of Christian books as well as stained-glass artwork depicting the life of Jesus Christ. Pastor John leads a prayer devotional with Christian Voice staff in the chapel every Monday, Tuesday, Thursday, and Friday morning to pray for intentions that listeners have submitted via Christian Voice’s website. On Wednesdays, he holds a Bible study in the chapel for the staff. In addition, the pastor of Epic Church, a church located nearby, uses the chapel for pastoral counseling. The River airs regular announcements informing listeners that the chapel is open to them daily for private prayer.
{¶ 13} Christian Voice’s basement meeting room is used regularly by groups and organizations with a religious focus, regardless of denomination. Epic Church uses the meeting room for several regular worship services, including a Sunday evening discipleship service, a Wednesday youth service, and a monthly service for the church’s leadership team. Alpha, a group described as an introduction to the Christian faith, also uses the meeting room. Boy Scout meetings are also held in this space. Christian Voice does not charge any of these organizations for their use of its chapel or meeting room.
*220 {¶ 14} The River is active in community outreach. Pastor John testified that part of The River’s ministry is doing work for the homeless — for example, by coordinating groups of volunteers at local food pantries. DJ Mary Harris testified that her off-air duties involve community outreach with various nonprofit organizations and individuals in need. She shared stories of locating a refrigerator and delivering it to a listener’s friend, collecting donations for a schoolteacher whose students needed clothes and shoes and delivering supplies to them, and collecting items for a family whose home had been destroyed by a fire. She also discussed the station’s involvement with an organization that assists women recovering from sexual trauma and drug addiction. David Baker, The River’s chief administrative finance officer, discussed the station’s material assistance to local crisis-pregnancy centers.
Procedural History
{¶ 15} Christian Voice filed its application for exemption for tax year 2008 on June 17, 2008. After the filing and the submission of requested supplemental information, the tax commissioner issued his determination on May 18, 2011. The commissioner cited BTA decisions holding that radio stations that broadcast religious programming do not equate to “[h]ouses used exclusively for public worship” under R.C. 5709.07(A)(2). He also found that there was “no evidence that people assemble to worship together on the subject property used exclusively as a radio station.” The commissioner denied the exemption claim, and Christian Voice appealed to the BTA.
{¶ 16} The BTA held a hearing at which Christian Voice presented ten witnesses and six exhibits; the tax commissioner offered no witnesses and introduced exhibits consisting mostly of financial statements and tax filings.
{¶ 17} The BTA issued its decision on August 22, 2014. The BTA acknowledged Christian Voice’s reliance on World Evangelistic Ent. Corp. v. Tracy, 96 Ohio App.3d 78, 644 N.E.2d 678 (2d Dist.1994), but distinguished that case as involving a station that was supported fully by donations without “advertising/underwriting” and that featured preaching and religious teaching on the air. BTA No. 2011-1446, 2014 Ohio Tax LEXIS 3942, 7-10 (Aug. 22, 2014). Under the circumstances, the BTA concluded that “the activities that occur at the subject property do not rise to [the] level” of “ ‘the open and free celebration or observance of the rites and ordinances of a religious organization.’ ” Id. at 11-12, quoting Faith Fellowship Ministries, Inc. v. Limbach, 32 Ohio St.3d 432, 435, 513 N.E.2d 1340 (1987), and citing Jimmy Swaggart Evangelistic Assn. v. Kinney, 6th Dist. Wood No. WD-82-64, 1983 Ohio App. LEXIS 5732 (Mar. 18, 1983). The BTA therefore affirmed the commissioner’s denial of the application.
{¶ 18} Christian Voice has appealed.
*221 Analysis

Standard of Review

{¶ 19} In reviewing a BTA decision, this court considers whether the decision was “reasonable and lawful.” R.C. 5717.04. Under this standard, we acknowledge that “ ‘[t]he BTA is responsible for determining factual issues and, if the record contains reliable and probative support for these BTA determinations,’ ” we will affirm them. (Brackets sic.) Satullo v. Wilkins, 111 Ohio St.3d 399, 2006-Ohio-5856, 856 N.E.2d 954, ¶ 14, quoting Am. Natl. Can Co. v. Tracy, 72 Ohio St.3d 150, 152, 648 N.E.2d 483 (1995). On the other hand, we “ ‘will not hesitate to reverse a BTA decision that is based on an incorrect legal conclusion.’ ” Id., quoting Gahanna-Jefferson Local School Dist. Bd. of Edn. v. Zaino, 93 Ohio St.3d 231, 232, 754 N.E.2d 789 (2001).
{¶ 20} The dispute between Christian Voice and the tax commissioner concerns not the underlying facts but whether those undisputed facts indicate that the property and attendant lands are a “[h]ous[e] used exclusively for public worship” and thus are entitled to the property-tax exemption under R.C. 5709.07(A)(2). Therefore, this appeal presents a question of law, Brennaman v. R.M.I. Co., 70 Ohio St.3d 460, 466, 639 N.E.2d 425 (1994), and our review is not deferential but de novo, State v. Codeluppi, 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, ¶ 9.

Public-Worship Exemption

{¶ 21} R.C. 5709.07(A)(2) exempts from real-property taxation “[h]ouses used exclusively for public worship, the books and furniture in them, and the ground attached to them that is not leased or otherwise used with a view to profit and that is necessary for their proper occupancy, use, and enjoyment.”
{¶ 22} We have previously held that for purposes of R.C. 5709.07, “ ‘public worship’ means the open and free celebration or observance of the rites and ordinances of a religious organization.” Faith Fellowship, 32 Ohio St.3d at 435, 513 N.E.2d 1340. In Faith Fellowship, three justices agreed that the Ohio Constitution, the basis from which the exemption originates, “contemplate^] that the worship be a celebration of a religious rite in an open and free place and not the everyday activities of an individual which express devotion to his or her God.” Id. at 436. To qualify under the public-worship exemption of R.C. 5709.07, the real property “must be used in a principal, primary, and essential way to facilitate the public worship.” Id. at paragraph two of the syllabus. While Justice Lanzinger’s dissenting opinion, id. at ¶ 91, may not be able to accept that “exclusively” means “primarily,” this is the interpretation of R.C. 5709.07 established by this court and applied for almost 30 years. See also Full Gospel Apostolic Church v. Limbach, 46 Ohio St.3d 195, 196, 546 N.E.2d 403 (1989); *222 Grace Cathedral, Inc. v. Testa, 143 Ohio St.3d 212, 2015-Ohio-2067, 36 N.E.3d 136, ¶ 30. This interpretation is also applied by the tax commissioner and the BTA to determine whether property is exempt pursuant to R.C. 5709.07. See Grace Cathedral, Inc. v. Testa, BTA No. 2012-2168, 2014 Ohio Tax LEXIS 963, 4-5 (Feb. 12, 2014). Although Justice Lanzinger seeks to limit the application of the syllabus language in Faith Fellowship “to those auxiliary buildings or portions of buildings * * * when there existed a primary building used exclusively for public worship,” dissenting opinion at ¶ 95, the holding is devoid of any such limiting language. Had the Faith Fellowship court intended “principal, primary, and essential” to apply only to the determination whether auxiliary buildings or portions of buildings qualified for exemption pursuant to R.C. 5709.07, it could have easily added this qualifying language. But it did not.
{¶ 23} Christian Voice relies on World Evangelistic, 96 Ohio App.3d 78, 644 N.E.2d 678, and the tax commissioner relies on Jimmy Swaggart, 6th Dist. Wood No. WD-82-64, in support of their respective positions. We conclude that neither decision adequately resolves the instant matter.
{¶ 24} Guidance for whether Christian Voice’s Gahanna property qualifies under the public-worship exemption of R.C. 5709.07(A)(2) is instead found in Maumee Valley Broadcasting Assn. v. Porterfield, 29 Ohio St.2d 95, 279 N.E.2d 863 (1972). The Maumee Valley Broadcasting Association was a nonprofit religious corporation that owned land upon which a broadcasting studio and 120-person auditorium were located. The tax commissioner argued that the Maumee Valley Broadcasting Association was not entitled to an exemption from sales and use taxes under R.C. 5739.02 because it was a radio station and not a “church” within the meaning of that statute.' We disagreed and advanced a holistic approach to determining whether an organization qualifies as a church:
With a view to substance, we are of the opinion that the [tax commis-sionerj’s isolation of the radio station from the total picture is unwarranted by the evidence in this case. The evidence amply shows that this facility merely implements the religious objectives of the organization. The character of any nonprofit corporation must be found, in its motives, its charter, its purposes, its methods, and its operation. Here, the appellee, like most churches, has dedicated all its land and buildings to charity and religion, and the operation of the radio station is not alone sufficient to change the underlying foundation of the corporation. Within the scope of common understanding, the appellee has demonstrated by evidence the necessary attributes of a church.
*223 Id. at 97-98. While Maumee Valley involved sales and use taxes, its analysis is applicable to real-property-tax exemptions.
{¶ 25} After our decision in Faith Fellowship, the General Assembly amended R.C. 5709.07, adopting a definition of “church” that embodied our prior case law. See Am.S.B. No. 71,117 Ohio Laws, Part 1,147, 148. That definition remains the same today: a “church” is “a fellowship of believers, congregation, society, corporation, convention, or association that is formed primarily or exclusively for religious purposes and that is not formed for the private profit of any person.” R.C. 5709.07(D)(1). In enacting this definition, the General Assembly recognized that as we stated in Faith Fellowship, in modern society “public worship involves more than formal religious rites and ordinances.” 32 Ohio St.3d at 438, 513 N.E.2d 1340 (Locher, J., joined by Wright and Brown, JJ., concurring in part and dissenting in part). As Justice Locher stated, “The life style of the people of Ohio has changed a great deal over the years, and the nature of public worship has changed with it. Formal church services today constitute only a portion of the worship experience, which now encompasses religious retreats, camps, athletics, and other social and recreational activities.” Id. at 438-439.
{¶ 26} As a church is but one type of house of public worship, the definition of church in R.C. 5709.07(D)(1) and the related case law must be considered when determining whether Christian Voice qualifies under the public-worship exemption of R.C. 5709.07(A)(2). To find that an organization embodies the attributes of a church sufficiently to satisfy R.C. 5709.07(D)(1) but to conclude that that organization does not operate as a “[h]ous[e] used exclusively for public worship” for purposes of R.C. 5709.07(A)(2) is incongruous.
{¶ 27} Christian Voice is a corporation with 26 U.S.C. 501(c)(3) status that conducts nondenominational religious activities through its broadcasts and on its premises. Devotional spots are aired throughout the day on The River, and a three-hour program that preaches a Christian message of hope and encouragement is broadcast on Sunday mornings. DJs inform listeners that pastoral counseling is available and that the chapel is open to the public for private prayer.
{¶ 28} The majority of Christian Voice’s broadcasts on The River are devoted to contemporary Christian music. The fact that Christian music makes up the majority of the broadcasting strengthens, not weakens, Christian Voice’s argument that its purpose is religious. “[MJusic is a vital means of expressing and celebrating those beliefs which a religious community holds most sacred. [It] is an integral part of many different religious traditions.” Equal Emp. Opportunity Comm. v. Roman Catholic Diocese of Raleigh, 213 F.3d 795, 802 (4th Cir.2000). “[T]he inspirational appeal of religion in the * * * guis[e] [of music] is often stronger than in forthright sermon.” Illinois ex rel. McCollum v. School Dist. *224 No. 71 Bd. of Edn., 333 U.S. 203, 236, 68 S.Ct. 461, 92 L.Ed. 649 (1948) (Jackson, J., concurring).
{¶ 29} Christian Voice employs Pastor John as a full-time minister. He and other Christian Voice staff members gather on a regular basis in the on-site chapel to pray for intentions that listeners have submitted. He also leads Bible study on a weekly basis in the chapel, and counseling services are available there to anyone who is in need.
{¶ 30} Christian Voice is also active in the community, performing acts of charity. It partners with a number of charitable organizations to provide assistance to the less fortunate. It also works directly with listeners who contact its station seeking assistance.
{¶ 31} Finally, Christian Voice provides its chapel and basement meeting room to the public regardless of denomination and without seeking compensation. The meeting room is used regularly by religious and charitable groups for worship services and religious discussion as well as for Boy Scout meetings.
{¶ 32} Christian Voice has presented evidence demonstrating that it is a corporation that was formed primarily or exclusively for religious purposes and not for the private profit of any person. See R.C. 5709.07(D)(1). Similar to Maumee Valley Broadcasting, Christian Voice “has dedicated all its land and buildings to charity and religion, and the operation of the radio station is not alone sufficient to change the underlying foundation of the corporation. * * * [It has] the necessary attributes of a church.” Maumee, 29 Ohio St.2d at 98, 279 N.E.2d 863. Accordingly, it follows that Christian Voice operates as a “[h]ous[e] used exclusively for public worship” under R.C. 5709.07(A)(2).
{¶ 33} In previously exempting Christian Voice’s New Albany property under R.C. 5709.07(A)(2), the tax commissioner relied upon the fact that Christian Voice has the attributes of a church. In 1991, the tax commissioner granted the exemption, “finding] that the real property * * * is used for church purposes.” (Emphasis added.) In 2013, almost two years after denying the exemption for the Gahanna parcel, the tax commissioner approved the continued exemption for the New Albany parcel, finding that that property “satisfies the requirements for exemption by reason of being used for church facilities.” (Emphasis added.)
{¶ 34} Even if true, the tax commissioner’s position that a physical assemblage of persons does not engage in worship activity on Christian Voice’s Gahanna property would not preclude the conclusion that Christian Voice is a church within the meaning of the statute. R.C. 5709.07(D)(1) does not require a congregation or worship activity; instead, its concern is whether the organization has a primarily religious purpose and is not for profit. We have also rejected the requirement that an organization must have a united body of communicants to be *225 a church when the organization exhibits the essential qualities of a church. Maumee Valley at 98.
{¶ 35} Finally, the BTA stated in its decision that even if Christian Voice’s broadcasts and other activities could be considered “public worship,” the sale of on-air advertising is not public worship but part of a commercial radio enterprise’s operations. The BTA’s focus on the sale of advertising is without support in R.C. 5709.07, which prohibits exemption for property being used “with a view to profit,” R.C. 5709.07(A)(2), (3), and (4), and for a church that was “formed for the private profit of any person,” R.C. 5709.07(D)(1). Christian Voice is a nonprofit corporation that sells on-air advertising to continue its ministry. It was not formed for private profit and its property is not being used to generate a profit. To the contrary, the revenue that is generated is for the religious mission of the corporation. In this respect, Christian Voice is no different from a church that sells advertising on weekly bulletins or on banners at church functions to raise revenue that allows the church to continue its religious ministry. The BTA’s position on revenue erodes the standing of traditional religious institutions as churches and houses of public worship.
{¶ 36} The chief justice’s dissenting opinion contends that we “ignor[e] the well-established rule in Ohio that ‘it is the use of the property and not the use of the proceeds derived therefrom’ that determines whether a tax exemption is conferred.” Dissenting opinion at ¶ 77, quoting Columbus Youth League v. Cty. Bd. of Revision, 172 Ohio St. 156, 158, 174 N.E.2d 110 (1961). However, we have applied this rule only in the context of the charitable-use exemption under R.C. 5709.12 — not the public-worship exemption under R.C. 5709.07(A)(2). The dissent’s attempt to extrapolate this rule into the public-worship exemption lacks support in our case law. The Ohio cases referenced by the dissent are neither factually similar — none involved a Christian radio station that exhibited the attributes of a church — nor present the current legal issue — application of the public-worship exemption. See Columbus Youth League (affirming denial of charitable-use exemption for baseball stadium owned by charitable institution and leased to professional baseball club because the property was not used exclusively, or even primarily, for charitable purposes); Inc. Trustees of Gospel Worker Soc. v. Evatt, 140 Ohio St. 185, 188, 42 N.E.2d 900 (1942) (affirming denial of charitable-use exemption for the part of charitable institution’s property that was used as living quarters for employees of religious printing and publishing establishment); Lutheran Book Shop v. Bowers, 164 Ohio St. 359, 361, 131 N.E.2d 219 (1955) (to qualify for charitable-use exemption under R.C. 5709.12, the test is the present use of the property rather than the ultimate use of proceeds received from the property); Zindorf v. Otterbein Press, 138 Ohio St. 287, 34 N.E.2d 748 (1941) (holding that not-for-profit publishing corporation’s use of property was not exclusively for charitable purposes when more than 40 percent *226 of total revenues came from commercial printing). Notably, there are no Ohio cases in which we have applied this rule in the context of R.C. 5709.07(A)(2). The chief justice’s reliance in her dissent on out-of-state authorities is also unavailing as those decisions interpret Illinois and Alaska statutes, each of which has language different from R.C. 5709.07(A)(2). See dissenting opinion at ¶ 78, citing Three Angels Broadcasting Network, Inc. v. Dept. of Revenue, 381 Ill.App.3d 679, 697, 319 Ill.Dec. 283, 885 N.E.2d 554 (2008), and Nome v. Catholic Bishop of N. Alaska, 707 P.2d 870, 879 (Alaska 1985).
{¶ 37} Moreover, our analysis focuses on the exclusive use of the property. In other words, we have considered how the property is primarily used. See Grace Cathedral, 143 Ohio St.3d 212, 2015-Ohio-2067, 36 N.E.3d 136, at ¶ 18 (resolution of an exemption claim pursuant to R.C. 5709.07(A)(2) focuses on whether the primary use of the property is public worship). As detailed above, the record clearly demonstrates that the primary use of Christian Voice’s land and building is for church purposes. Accordingly, Christian Voice uses its property “exclusively for public worship” under R.C. 5709.07(A)(2).
{¶ 38} In reaching this conclusion, the chief justice’s dissent accuses us of blatant activism. Dissenting opinion at ¶ 47. However, the charge of activism is misdirected and gratuitous as our conclusion gives entire effect to R.C. 5709.07(A)(2), is supported by relevant case law, and reaches the same conclusion that the tax commissioner reached in two separate final determinations issued 21 years apart, one of which was issued after the determination at issue in this appeal.
{¶ 39} The tax commissioner’s failure to consider whether Christian Voice exhibits the essential qualities of a church in determining whether it is a “[h]ous[e] used exclusively for public worship” resulted in an overly narrow construction based on an incorrect legal conclusion. We agree with Christian Voice’s first argument — namely, that the primary use of its property is for public worship. Because we allow the exemption under R.C. 5709.07(A)(2), we do not address Christian Voice’s remaining arguments.
Conclusion
{¶ 40} Christian Voice’s Gahanna property qualifies for the property-tax exemption for “[h]ouses used exclusively for public worship” under R.C. 5709.07(A)(2). The decision of the BTA is reversed, and the exemption is allowed for tax year 2008 in accordance with the application filed in this case in that year.
Decision reversed.
PfeifeR, O’Donnell, and French, JJ., concur.
*227 O’Connor, C.J., dissents, with an opinion that Lanzinger, J., joins.
Lanzinger, J., dissents, with an opinion that O’Neill, J., joins in all but the final sentence.

. According to Christian Voice’s 2008 exemption application, programming originating on the property at that time aired on nine radio stations. By the time of the BTA hearing in May 2013, Christian Voice was operating only three stations.